# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA
### PITTSBURGH

ISIAH ANDREW ROTEN,       )
                                    )
        Plaintiff,        )   Civil Action No. 2:23-cv-00020
                                    )
    vs.               )   United States Magistrate Judge
                                    )   Cynthia Reed Eddy
GEORGE LITTLE, et al.,     )
                                    )
        Defendants.     )

## MEMORANDUM OPINION[1]

**CYNTHIA REED EDDY, United States Magistrate Judge**

Pending before the Court are three motions to dismiss Plaintiff's Verified Complaint. (ECF Nos. 27, 33, and 48). For the reasons that follow, the motion filed by the Corrections Defendants will be denied in its entirety, and the motions filed by the Medical Defendants and the Centurion Defendants will be granted in part and denied in part.

---

[1] In accordance with the provisions of 29 U.S.C. § 636(c)(1), Plaintiff and the named and served Defendants have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including trial and the entry of a final judgment. Restricted ECF Nos. 30, 31, 32, and 35. While named and unserved parties generally must also consent for a magistrate judge to exercise jurisdiction based on "consent of the parties" under that statute, *see Burton v. Shamp,* 25 F.4th 198 (3d Cir. 2022) *(*citing with approval *Williams v. King*, 875 F.3d 500 (9th Cir. 2017) and *Coleman v. Labor and Industry Rev. Comm'n*, 860 F.3d 461 (7th Cir. 2017)), this Court is unaware of any decision holding that consent is necessary from defendants who are both unserved and unidentified, such as the Doe defendants here. Courts disregard such defendants in other contexts, including contexts affecting jurisdiction. *See, e.g.*, 28 U.S.C. § 1441(b)(1) (providing that for removal based on diversity of citizenship, "the citizenship of defendants sued under fictitious names shall be disregarded"); *Fat T, Inc. v. Aloha Tower Assocs. Piers 7, 8 & 9,* 172 F.R.D. 411, 414–15 (D. Haw. 1996) (reaching the same conclusion for diversity jurisdiction over cases first filed in federal court). The Court therefore concludes that consent of the unserved Doe defendants here, RDS John Doe and Jane Doe2 specifically, is unnecessary to proceed under § 636(c).

## I.      Jurisdiction

The Court has federal jurisdiction over the Verified Complaint as it asserts claims under Title II of the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and 42 U.S.C. §1983.[2]

## II.     Procedural History

Plaintiff, Isiah Andrew Roten, a state prisoner in the custody of the Pennsylvania Department of Corrections ("DOC") incarcerated at SCI-Greene, initiated this pro se civil rights action on January 6, 2023, by submitting a typewritten 56-page Verified Complaint with 249 paragraphs, and approximately 150 pages of exhibits attached.   (ECF No. 1).   The Verified Complaint was lodged as it did not come with a Motion for Leave to proceed in forma pauperis ("IFP Motion") or the filing fee.   On January 30, 2023, the filing fee was paid in full (ECF No. 4) and the Verified Complaint was formally filed that day. (ECF No. 6).

Each of the Defendants has moved to dismiss the Verified Complaint. Because the Centurion Defendants presented material outside the Verified Complaint, specifically documents relating to Roten's grievance history, the Court converted that motion to dismiss into a motion for summary judgment on the issue of exhaustion of administrative remedies _only_ and allowed the parties time to submit additional briefing and evidence.   _See Renchenski v. Williams_, 622 F.3d 315 (3d Cir. 2010); _In re Rockefeller Properties, Inc. Securities Litig._, 184 F.3d 280 (3d Cir. 1999). Roten was advised that in converting the Centurion Defendants' motion to dismiss into a motion for summary judgment on this issue, the exhaustion issue will be evaluated under the standard in

---

[2]      In response to the Medical Defendants arguments that Roten failed to filed a Certificate of Merit for his claims of professional negligence, _see_ ECF No. 28 at p. 16, Roten specifically states " the `gist of the action' here does not resound in any supplementary state law claims.  There are no freestanding supplemented state law claims for malpractice or negligence or other torts."  _See_ Omnibus Resp. at p. 12. (ECF No. 58).

Rule 56 of the Federal Rules of Civil Procedure. Roten was advised that the remainder of the Centurion Defendants' motion would be decided under the well-established standards for deciding motions to dismiss.

Roten filed responses to the motions to dismiss. (ECF Nos. 54, 54-1, and 58). The Centurion Defendants filed Reply Briefs  (ECF Nos. 55 and 61) and Roten filed a Supplemental Omnibus Response. (ECF No. 67).  The matter is now ripe for resolution.

### III.    The Verified Complaint[3]

Roten brings this civil rights action pro se alleging violations of Title II of the Americans with Disability Act ("ADA") (Count I),  Section 504 of the Rehabilitation Act ("RA") (Count II), and § 1983 claims for violations of the Eighth and Fourteenth Amendments (Counts III and IV). He seeks compensatory and punitive damages as well as declaratory and injunctive relief. (Verified Comp., Prayer for Relief).

Named as defendants are over three-dozen parties, including DOC officials and employees, two private companies contracted to provide medical services to DOC prisoners (Wellpath and Centurion), two Wellpath employees, four Centurion employees, and two unnamed Doe Defendants.[4]   All Defendants are sued in their individual and official capacities. Verified Comp.,

---

[3]     The Court accepts as true the facts as they appear in the Verified Complaint and draws all possible inferences from those facts in the light most favorable to Plaintiff. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008); *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972).

[4]     Defendants Wellpath  Holdings, LLC; Tonya Tate, and James Fetterman are collectively called the "Medical Defendants." Defendants Centurion  Health LLC, Amy Silberschmidt, Ingrid Renberg, PCRNP Mason, and PCRNP J.L. Trout are collectively referred to as the "Centurion Defendants."  Defendants George Little, Tabb Bickell, Michael Zaken, Stephen Buzas, Michael Dialesandro, Martin Switzer, Maureen Malanoski, Carla Swartz, Daniel Coulehan, Security Lt. Arnold, Lt. Gagnon, Eric Ryan Hurd, James Wittman, Lt. Hollowood, Lt. McCormack, Dylan Long, H. Ingrham, C/O P. Churilla, C/O Grim, C/O II K. Davis, C/O R. Myers, C/O C. Lewis, Gal Rowe, and Ross Smith are collectively called the "Corrections Defendants."

at ¶¶ 5 – 38.  Roten contends, among other things, that despite having an extensive documented lifelong history of serious mental health issues, including several suicide and self-harm attempts, Defendants have denied him effective mental health and medical care, he remains in indefinite solitary confinement, confined in housing units with conditions detrimental to his wellbeing, and is being denied reasonable accommodations to effectively manage his treatment needs.

Central to this case are the events before and after Roten's self-described "preventable suicide attempt" on May 27, 2022.  Verified Complaint, at ¶ 181.   Roten contends the suicide attempt would have been preventable had he been provided with appropriate psychiatric care, including not being housed in SCI Greene's Intensive Management Unit ("IMU") on the Restricted Release List ("RRL").[5]  Upon discovering Roten unconscious in his cell on May 27, 2022, Roten was  taken to SCI-Greene's medical department and then transported to an outside hospital. Upon his return that same evening to SCI-Greene, he was placed in a Psychiatric Observation Cell ("POC").

Roten was housed in two different POCs from May 27, 2022, through June 20, 2022, where he contends that the cells were a "filthy, denigrating and tortuous environment."  *Id.* ¶¶ 149 – 161.  He also contends that while housed in a POC, he was provided inadequate psychiatric care by the SCI Greene Suicide Prevention Committee as well as inadequate physical medical care to his "substantial injuries" sustained as a result of his suicide attempt.  *Id.* ¶ 181.

On June 16, 2022, Roten appealed to the Facility Manager requesting to be removed from solitary confinement in the IMU on RRL status.  According to Roten, his request was denied

---

[5]    Roten states upon his transfer from SCI-Dallas to SCI-Greene in December 2021, Verified Complaint at  ¶ 44(o), he should have been transferred to SCI-Greene's Population RRL/MCU ("Management Control Unit).  Instead, he was transferred to SCI-Greene's Intensive Management Unit ("IMU"). Verified Complaint, at ¶ 93.

without any individualized consideration. *Id.* ¶¶ 203 – 205. Roten contends there was an inadequate procedural review and there are no "available remedies for Mr. Roten to be removed from solitary confinement in the IMU or removed from the [RRL]." *Id.* ¶ 208.

On June 20, 2022, Roten was removed from the POC and relocated to L-unit, where he was returned to solitary confinement. *Id.* ¶ 194. He contends that "the conditions of solitary confinement exacerbated his physical bladder disability, causing further injuries to his person," requiring emergency care on multiple occasions. *Id.* ¶¶ 196, 200. He states being relocated to the L-unit compelled him to participate in IMU activities, requiring him to increase his mobility, *id.* ¶ 197, and that he "suffered from multiple occurrences of urethral bleeding, severe pain, and further tissue damage, in the IMU, that he did not experience in the POC." *Id.* ¶ 198.

The Verified Complaint also details the conditions Roten faces in IMU/RRL, all of which he contends have led to the deterioration of his physical and mental disabilities. Roten repeatedly requests to be taken off single-cell "Z-Code." According to Roten, he has been told that even if he is removed from single-cell Z-Code, "he will not receive a cell mate as long as he is in the IMU on RRL." Roten argues he remains a suicide risk in a cell alone. *Id.* ¶¶ 209 – 225.

## IV.    Standard of Review[6]

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1983). In order "[t]o

---

[6]      Because Roten is proceeding pro se, his allegations, "however inartfully pleaded," must be held to "less stringent standards than formal pleadings drafted by lawyers." *Haines v. Kerner*, 404 U.S. 519, 520-521 (1972). Moreover, under the liberal pleading rules, during the initial stages of litigation, a district court should construe all allegations in a complaint in favor of the complainant. *Gibbs v. Roman*, 116 F.3d 83 (3d Cir. 1997). Despite this liberality, *pro se* litigants are not relieved of their obligation to allege sufficient facts to support a cognizable legal claim. *See, e.g.*, *Taylor v. Books A Million, Inc.*, 296 F.3d 376, 378 (5th Cir. 2002); *Riddle v. Mondragon*, 83 F.3d 1197, 2102 (10th Cir. 1996).

survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).   A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). "Conclusory allegations of liability are insufficient" to survive a motion to dismiss.   *Garrett v. Wexford Health*, 938 F.3d 69, 92 (3d Cir. 2019) (quoting *Iqbal*, 556 U.S. at 678–79).   To determine whether a complaint survives a motion to dismiss, a court identifies "the elements a plaintiff must plead to state a claim for relief," disregards the allegations "that are no more than conclusions and thus not entitled to the assumption of truth," and determines whether the remaining factual allegations "plausibly give rise to an entitlement to relief." *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012).   Thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). The factual and legal elements of a claim should be separated, with the court accepting all well-pleaded facts as true and disregarding all legal conclusions.   *Santiago v. Warminster Twp.*, 629 F.3d 121, 130-31 (3d Cir. 2010).   Under this standard, civil complaints "must contain more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).   A court in making this determination must ask "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." *Twombly*, 550 U.S. at 583 (quoting *Scheuer v. Rhoads*, 416 U.S. 232, 236 (1974) (internal quotations omitted).

Under Rule 12(b)(6), the court must accept all well pleaded allegations as true and construe all reasonable inferences in favor of the nonmoving party. *Doe v. Univ. of the Scis.*, 961 F.3d 203,

208 (3d Cir. 2020). A court may consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record" as well as "undisputedly authentic document[s] that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Factual allegations within documents described or identified in the complaint also may be considered if the plaintiff's claims are based on those documents. *Id.* (citations omitted). In addition, a district court may consider indisputably authentic documents without converting a motion to dismiss into a motion for summary judgment. *Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004); *Lum v. Bank of America*, 361 F.3d 217, 222 (3d Cir. 2004) (in resolving a motion to dismiss under Rule 12(b)(6), a court generally should consider "the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

The United States Court of Appeals for the Third Circuit has held that, in civil rights cases, a court must give a plaintiff the opportunity to amend a deficient complaint - whether or not the plaintiff requests to do so - when dismissing a case for failure to state a claim, unless doing so would be inequitable or futile. *See Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). "However, we need not provide a plaintiff with leave to amend if amendment would be inequitable or futile." *Thompson v. Police Dep't of Philadelphia*, 2011 WL 4835831, at *2 (E.D. Pa. Oct. 12, 2011) "Where a claim is frivolous, amendment is necessarily futile and, thus, leave to amend is not warranted. A claim is frivolous when it lacks an arguable basis in either law or in fact." *Id.* (internal citation and quotation marks omitted).

**V.      Discussion and Analysis**

**A.      Exhaustion**

The Centurion Defendants argue that Roten has exhausted no claims against Centurion Defendants Trout, Renberg, or Mason, and in support of their motion have provided copies of various grievances filed by Roten.  (ECF No. 49, Exh. A – H).  Once a defendant properly raises exhaustion, the district court must consider it a threshold matter.[7] *Downey v. Pennsylvania Dep't of Corr.,* 968 F.3d 299, 304–05 (3d Cir. 2020) (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *Rinaldi v. United States*, 904 F.3d at 265. The exhaustion requirement is not a technicality, rather it is a federal law which federal district courts are required to follow.  *Nyhuis v. Reno*, 204 F.3d 65, 73 (3d Cir. 2000).

Under the Prison Litigation Reform Act of 1995 ("PLRA"), a prisoner has to pursue all avenues of relief available within the prison's grievance system before bringing a federal civil rights action concerning prison conditions.  42 U.S.C. § 1997e(a); *Booth v. Churner*, 206 F.3d 289, 291 (3d Cir. 2000), *aff'd*, 532 U.S. 731 (2001).   The failure of an inmate to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove.  *Jones v. Bock*, 549 U.S. 19, 218 (2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018).

---

[7]      The Medical Defendants seem to argue that Plaintiff failed to exhaust administrative remedies against them because  the "Complaint does not state, mention or otherwise reference his exhaustion of administration of administrative remedies prior to filing this instant Complaint." Br. at p. 15 (ECF No. 28).  But the failure to exhaust available administrative remedies is an affirmative defense, and as such it must be pleaded and proven by a defendant. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Brown v. Croak*, 312 F.3d 109, 111 (3d Cir. 2002).  There is no requirement that plaintiffs must address exhaustion in their complaints.  Therefore, the Court will deny without prejudice the Medical Defendants' argument that dismissal is appropriate based on failure to exhaust.  The Medical Defendants' may raise and brief the issue at the summary judgment stage.

The PLRA requires proper exhaustion, meaning that an inmate must "complete the administrative review process in accordance with the applicable procedural rules." *Downey v. Pennsylvania Dep't of Corr.*, 968 F.3d 299, 305 (3d Cir. 2020) (citing *Woodford*, 548 U.S. at 88). These procedural rules are supplied by the individual prisons. *Jone*s, 549 U.S. at 218; *Spruill v. Gillis,* 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim . . . is made by evaluating the prisoner's compliance with the prison's administrative regulations governing inmate grievances"). The Supreme Court of the United Court has instructed that,

> Compliance with prison grievance procedures, therefore, is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion.

*Jones,* 549 U.S. at 218. For inmates in the custody of the Pennsylvania Department of Corrections, DC-ADM 804 provides the relevant grievance procedures available to state prisoners. The DOC grievance procedures "supply the yardstick" to determine whether Roten procedurally defaulted his claims under the PLRA in failing to name the defendants individually in his grievances.

The PLRA itself does not have a "name all defendants" requirement. *Byrd v. Shannon,* 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones,* 549 U.S. at 217). But the DOC grievance policy states that the inmate "shall identify individuals directly involved in the event(s)." DC-ADM 804, Inmate Grievance System Procedures Manual, Section 1 – Grievances & Initial Review, Section 1(A)(11)(b). *See* https://www.cor.pa.gov. (last viewed 4/2/2024). *See also Jackson v. Carter*, 813 Fed. App'x 820, 823 (3d Cir. 2020); *Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020). As for this requirement, the Court of Appeals for the Third Circuit has held that "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant

constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. App'x 554, 557 (3d Cir. 2005).

The Centurion Defendants assert Roten filed five grievances concerning the claims asserted in the Verified Complaint, and none of these grievances named Centurion Defendants Trout, Renberg, or Mason. In response, Roten states he has filed eight grievances that either directly or indirectly named J.L. Beiter (Trout);[8] Renberg, and Mason.[9]

After review, the Court agrees with the Centurion Defendants and finds that any claims against Defendants Trout, Renberg, or Mason have not been properly exhausted. Each of the relevant Grievances is part of the record and will be reviewed in turn.

(1) Grievance 984611, submitted 06/05/2022, states that the grievance is being filed to,

> challenge the inadequate physical and mental healthcare, caused by PADOC employee interference in the form of [deliberate indifferences], etc., that I was subjected to immediately after a suicide by overdose attempt on Friday May 27, 2022, which occurred both on SCI Greene institutional grounds and at the outside hospital in Waynesburg PA causing further injuries.

---

[8]   Roten states that "Defendant Trout was misidentifying herself as DR. BEITER when Roten filed his initial grievances against Centurion in April – May 2022." P's Resp. ¶ 1 (ECF No. 54). In the Verified Complaint, Defendant J. L. Trout is identified as a "psychiatric certified registered nurse practitioner." Verified Compl., at ¶ 31. "After filing those grievances, SCI GREENE LT TROUT married PCRNP BEITER, who then changed her name to Julie Lynn Trout." Decl. of Isiah Roten, at ¶ 8 (ECF No. 54-1).

[9]   Along with the five grievances identified by the Centurion Defendants, Roten states three additional grievances, which are also in the record, are relevant: Grievance 980504 submitted 05/16/2022, which complained of programming (ECF No. 49-4 at p. 66); Grievance 988492 submitted 07/08/2022 grieving his transfer from the infirmary to L-Unit stating that he was moved for retaliatory reasons (ECF No. 49-6 at p. 27); and Grievance 1002476 submitted 10/17/2022 and involves the denial of a request for a ADHA elimination diet. (ECF No. 49-6 at p. 5). Defendants Trout, Renberg, or Mason were not named in Grievance 980504. "Dr. Trout/Beiter," however, is named in Grievance 988492 in which Roten claims his rights have been violated because of retaliatory actions taken by security and medical and "Dr. Trout" is named in Grievance 1002476 in which Roten grieves the denial of a request for a ADHA elimination diet. Neither of these claims, however, have been brought in this lawsuit.

Grievance Appeal, ECF No. 49-8, at p. 40.   Specifically named in the grievance are four

individuals.   (*Id*. at p. 35).  Defendants Trout, Renberg, or Mason are not named in this Grievance.

(2) <u>Grievance 984612</u>, submitted 06/07/2022, states that the grievance is being filed to,

> challenge inadequate mental healthcare and deliberate indifferences to my
> serious mental health needs, inadequate psychiatric treatment care, etc., that
> is causing me ongoing mental /emotional injury, deterioration, and places
> my life safe and physical well being at risk for further suicide attempts, self-
> injurious actions, and death.
>
> Specifically, I am grieving the deliberate indifference and inadequate
> psychiatric care treatment I received during the psychiatric reviews I
> attended on Tuesday, May 31, 2022; on Wednesday, June 1, 2022; on
> Thursday, June 2, 2022; and June 7, 2022, from PRT and members of the
> SCI Greene Suicide Prevention Committee.

Grievance 984612 (ECF No. 49-8 at p. 47).  Specifically named in the grievance are the PADOC,

Centurion LLC; Wellpath LLC, and about fifteen named individuals, and  John/Jane Does.

Defendants Trout, Renberg, or Mason are not named in this Grievance.  (*Id.* at p. 48).

(3)      <u>Grievance 984613</u>, submitted 06/06/2022 – concerns the conditions of the POC

cells.  (*Id*. at p. 2).   Specifically named in the Grievance are PADOC, Centurion LLC, Wellpath,

LLC. and about twelve named individuals, POC Lt. John/Jane Doe; POC Sgt. John/Jane Doe; and

POC Co1 John/Jane Doe.  Defendants Trout, Renberg, or Mason are not named in this Grievance.

(*Id.* at p. 3).

(4)      <u>Grievance 984614</u>, submitted 6/03/2022, states Roten is challenging "the

inadequate mental health care, deliberate indifferences to my serious mental health needs, etc . . .

and the overall mental health conditions.  Specifically, on Tuesday, May 24, 2022, I was deprived

of access to PA DOC psychiatric treatment."  (*Id.* at p. 14).  Specifically named in the grievance

are the PADOC, Centurion LLC; Wellpath LLC, and about fourteen named individuals, and

John/Jane Does.  Defendants Trout, Renberg, or Mason are not named in this Grievance.  (*Id.* at p. 14-15).

(5)  <u>Grievance 984615</u>, submitted 06/04/2022, states Roten is challenging "the inadequate mental health care, deliberate indifferences to my serious mental health needs, etc., that I am experiencing on RRL in the SCI Greene IMU; the overall mental health conditions are unconstitutional." (*Id.* at p. 26). Specifically named in the grievance are the PADOC, Centurion LLC; Wellpath LLC, and about fourteen named individuals, and John/Jane Does. Centurion Defendants Trout, Renberg, or Mason are not named in this Grievance.  (*Id.* at p. 27).

The failure to identify Centurion Defendants Trout, Renberg, or Mason in these relevant five grievances constitutes a "procedural default," and does not amount to "proper exhaustion." That said, the Court of Appeals for the Third Circuit has held that the prison can excuse an inmate's failure to specifically name individuals by identifying the unidentified persons and acknowledging that they were "fairly within the compass of the prisoner's grievance." *Spruill*, 372 F.3d at 234. Put another way, this procedural default may be excused where there is an "indication in the record that prison administrators knew that the defendant was involved in the incident." *Whitehead v. Thomas*, 2017 WL 2664490, at *5 (W.D. Pa. May 23, 2017) (citing *Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013)). This is because, as our appellate court reiterated, "the primary purpose of a grievance is to alert prison officials to a problem, not to provide personal notice to a particular official that he may be sued." *Diaz v. Palakovich*, 448 F. App'x 211, 217 (3d Cir. 2011).

The Court finds there is insufficient evidence of record from which it can be concluded that the actions of Centurion Defendants Trout, Renberg, or Mason were "fairly within the compass" of any of the five relevant grievances.  *Spruill*, 373 F.3d at 234.  Given this finding,

Centurion Defendants Trout, Renberg, or Mason will be dismissed from this case based on Roten's failure to fully exhaust his administrative remedies.[10]

### B.  Statute of Limitations

The "Relevant Factual History" of the Verified Complaint provides a comprehensive history of Roten's long history of mental disabilities and treatments, his criminal history, and various institutions Roten has been placed in through the years. *See* Verified Compl,, at ¶ 44 (a) - (h).    The background includes information about hospitalizations while Roten was a minor, juvenile placements, and adjudications of juvenile proceedings.

In 2015, Roten was charged as an adult in the Court of Common Pleas of Dauphin County with Attempted Homicide, Robbery, Aggravated Assault, and Prohibited Possession of a Firearm. *Id*. ¶ 44 (i). *See Commonwealth v. Roten*, Docket No. CP-22-cr-0002176-2015.   On May 5, 2016, he entered a guilty plea to the Robbery, Aggravated Assault, and firearm charges and was sentenced to term of incarceration of 7 – 15 years.

After his sentencing in May 2016, Roten was transferred to SCI-Camp Hill.  Since that time, he has been in DOC custody at various institutions.   He was transferred to SCI-Smithfield shortly after being processed at SCI-Camp Hill.  He remained at SCI-Smithfield until his transfer to SCI-Rockview in October 2017.  The next year, he was transferred to SCI-Fayette, where he remained until February 2020, when he was transferred "due to security reasons." Verified Compl., ¶ 44(m).   In October 2020, he was transferred from SCI-Forest to SCI-Dallas.  In December 2021,

---

[10]      In opposition, Roten argues that he filed these grievances from the infirmary and "that he was non compos mentis to be filing grievances then and that he was experiencing severe pain from his suicide injuries."  Pl's Br. ¶ 21 (ECF No. 54).  The Court finds Roten's argument in this regard not credible, as the grievances each contain detailed information and specifically name multiple individuals.

Roten was transferred to SCI-Greene and placed in the Intensive Management Unit ("IMU"). According to Roten, in many of these DOC institutions, he was placed in solitary confinement, often after attempting suicide. *Id.* ¶¶ 44 (j), (k), (l), (m), (o), and (p). It is unclear if this factual information is provided for historical detail only or if the claims in this suit are based on the details of these confinements.

The Corrections Defendants argue that Roten's claims occurring prior to his transfer to the IMU at SCI-Greene in December 2021 should be dismissed with prejudice as untimely because they occurred outside the applicable statute of limitations and are therefore barred. (ECF No. 34, at pp. 4 – 7). Roten argues that the continuing-violations doctrine should save his claims from the statute of limitations as he has been in "indefinite solitary confinement" since December 2020 and that Corrections Defendant Little signed Roten onto the RRL in December 2021. *See* Pl's Supp. Omnibus Resp., at p. 2 (ECF No. 67).

Because the ADA, the RA, and § 1983 do not contain an express limitation period, their statutes of limitations are determined by looking to the limitations period for the most analogous cause of action in the state in which the Court sits. For Roten's claims, this is Pennsylvania's two-year limitations period for personal injury actions. 42 Pa. C.S. § 5524. Accordingly, the statute of limitations for Roten's claims is two years.

Giving Roten the benefit of the prison mailbox rule, this case was initiated on December 29, 2022. (Verified Compl., at p. 56). Therefore, Roten's claims will be time-barred if they accrued before December 29, 2020. From the Verified Complaint, it appears that Roten was officially placed by Corrections Defendant Little on the RRL in December 2021 while housed at SCI-Dallas, and then transferred to SCI Greene IMU soon thereafter. *See* Verified Compl., ¶ 44(o). However, Roten argues that his indefinite solitary confinement, as well as his placement in the IMU on the

RRL, are acts that are part of a course of conduct alleged to have violated Roten's rights under the Eighth and Fourteenth Amendments. Roten also alleges that he continually has been denied accommodations since being placed in the IMU on RRL. At this stage of the litigation, the Court finds that the continuing-violations doctrine saves Roten's claims from being barred by the applicable statute of limitations.

### C.     Claims Brought Under Title II of the ADA and the RA

Roten asserts claims under Title II of the ADA and Section 504 of the RA against all the Defendants only in their official capacities. Verified Comp., ¶ 266 - 232. "Both the ADA and the RA require public entities, including state prisons, to provide, in all of their programs, services, and activities, a reasonable accommodation to individuals with disabilities." *Furgess v. Pa. Dep't of Corr.*, 933 F.3d 285, 287 (3d Cir. 2019) (emphasis added). "[W]hen a plaintiff sues under both the RA and the ADA, [courts] often address both claims in the same breath, construing the provisions of both statutes in light of their close similarity of language and purpose," since "the scope of protection afforded under both statutes, i.e., the general prohibition against discrimination, is materially the same." *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 117 (3d Cir. 2018) (internal quotations, citations, and alterations omitted). The elements of a claim under the ADA and RA are the same, except that the plaintiff must also show under the RA that the program in question received federal dollars.[11] *See* 29 U.S.C. § 794; *Gibbs v. City of Pittsburgh*, 989 F.3d 226, 229 (3d Cir. 2021).

---

[11]     "Causation standards differ between the ADA and RA: Under the RA, the disability must be the sole cause of the discriminatory action, while the ADA only requires but-for causation." *Durham*, 82 F.4th at 226 (citing *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 235-36 & n.11 (3d Cir. 2013).

The proper defendant under a Title II ADA claim is the public entity or an individual who controls or directs the functioning of the public entity.  *See Emerson v. Thiel Coll.*, 296 F.3d 184, 189 (3d Cir. 2002).  The proper defendant in a RA claim is the public entity receiving federal assistance.  *A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791, 804 (3d Cir. 2007) (stating that "suits may be brought pursuant to Section 504 against recipients of federal financial assistance, but not against individuals").

Defendants Wellpath and Centurion are not public entities.  "A private corporation is not a public entity merely because it contracts with a public entity to provide some service." *Matthews v. Pa. Dep't of Corr.,* 613 F. App'x 163, 170 (3d Cir. 2015) (dismissing the Title II claims against the medical contractor and its employees because they did not qualify as a "public entity" within the meaning of the statute.").  Therefore, to the extent that Roten asserts ADA and RA claims against Wellpath and Centurion, and their employees, those claims will be dismissed with prejudice.  *Keifer v. PrimeCare Med., Inc.,* 2017 WL 3142279, at *3 (E.D. Pa. July 24, 2017) (granting motion to dismiss ADA claim against PrimeCare because it is not "an instrumentality of the state or otherwise a public entity").

State prisons, however, are deemed "public entities" under Title II and the Supreme Court has held that prisoners are covered by the ADA.  *Pennsylvania Dep't of Corr. v. Yeskey*, 525 U.S. 206, 210 (1998).  "The phrase 'service, program, or activity' under Title II . . . 'is extremely broad in scope and includes anything a public entity does'." *Furgess v. Pa. Dept. of Corr.*, 933 F.3d 285, 289 (3d Cir. 2019).  As a result, "a prison's refusal to accommodate inmates' disabilities in such fundamentals as mobility, hygiene, medical care, and virtually all other prison programs constitutes a denial of the benefits of a prison's services, programs, or activities under Title II" of the ADA.  *Id.* at 290.

Roten did not name the DOC as a defendant; he did, however, name George Little, the Secretary of the DOC in his official capacity.  Since George Little as Superintendent was the individual who "control[ed] or direct[ed] the functioning of the public entity," *i.e.,* the DOC, the Court construes Roten's claim against George Little, in his official capacity, as asserting a Title II ADA and RA violation against the DOC.

The Corrections Defendants only argument pertaining to Roten's ADA and RA claims is that he has named improper defendants as he cannot assert "claims against government employees in their individual capacities." Br. at 8 (ECF No. 34). As noted above, Roten's ADA and RA claims have been brought against the Corrections Defendants only in their <u>official</u> capacities.  He did not bring these claims against the Defendants in their individual capacities.

The Corrections Defendants may challenge on the merits the various elements of these claims and the reasonableness of Roten's requested accommodations at the summary judgment stage of the case when the Court has the benefit of a more complete record.  For now, Roten's ADA and RA claims will proceed into discovery against the Corrections Defendants in their official capacities only.[12]

### D.    Claims Brought Pursuant to 42 U.S.C. § 1983

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation

---

[12]    Although state officials may not be sued in their official capacity for monetary damages, they may be sued where the plaintiff seeks prospective injunctive relief. *See Ex parte Young*, 209 U.S. 123 (1908).  "[A] person seeking purely prospective relief against state officials for ongoing violations of federal law may sue under the 'legal fiction' of *Ex parte Young*, despite the text of the Eleventh Amendment." *Koslow v. Pennsylvania*, 302 F.3d 161, 168 (3d Cir. 2002) (citing *Alden v. Maine*, 527 U.S. 706, 757 (1999)). In *Koslow*, the Court of Appeals for the Third Circuit allowed the plaintiff to present "federal claims under the ADA against [an individual defendant], acting in his official capacity, for prospective injunctive relief." *Koslow*, 302 F.3d at 179.

> of any rights, privileges, or immunities secured by the Constitution and laws, shall
> be liable to the party injured in an action at law, suit in equity, or other proper
> proceeding for redress. . . .

42 U.S.C. § 1983.  The Supreme Court of the United States has held that section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred by those parts of the United States Constitution and federal statutes that it describes." *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979). To be afforded remedy in federal court, plaintiffs must prove two elements. First, they must show a "violation of a right secured by the Constitution and laws of the United States." *West v. Atkins*, 487 U.S. 42, 48 (1988). Second, they must "show that the alleged deprivation was committed by a person acting under color of state law." *Id*. at 48. Defendants do not dispute that at all times they were acting under color of state law. As a result, the Court's analysis must focus on whether Defendants deprived Roten of a right secured by the Constitution or laws of the United States.  Roten contends that all the Defendants, in their individual capacities only, have violated his constitutional rights under the Eighth and Fourteenth Amendments.

### 1.    Eighth Amendment

The Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on prisoners.  U.S. Const. amend. VIII.  In the most general sense, a prison official violates the Eighth Amendment when these two elements are established: (1) the inmate alleges an objectively serious deprivation by a prison official of food, clothing, shelter, medical care, or safety; and (2) the prison official acted with a sufficiently culpable state of mind to deprive the inmate of his right to food, clothing, shelter, medical care, or safety.  *Farmer v. Brennan*, 511 U.S. 825, 832, (1994) (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984)).

### a.      Deliberate Indifference to Serious Medical Needs

Roten's deliberate indifference claim involves events (i) leading up to his suicide attempt on May 27, 2022; and (ii) events occurring after the May 27, 2022, suicide attempt.

"[D]eliberate indifference to serious medical needs of prisoners constitutes the unnecessary and wanton infliction of pain proscribed by the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97 (1976) (internal quotation omitted). To establish a violation of his constitutional right to adequate medical care, a plaintiff must allege facts that demonstrate: (1) he had a serious medical need, and (2) acts or omissions by prison officials that reflect deliberate indifference to that need.  *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999). A serious medical need exists when a "failure to treat can be expected to lead to substantial and unnecessary suffering." *Colburn v. Upper Darby Twp.*, 946 F.2d 1017, 1023 (3d Cir. 1991). Deliberate indifference is manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, denial of prescribed medical treatment, a denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury." *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

The Court finds that, for purposes of this Memorandum Opinion only, the allegations in the Verified Complaint related to the nature and severity of Roten's mental and physical health satisfy the "serious medical need" element of his Eighth Amendment claim.  Accordingly, only the second prong of the deliberate indifference test is at issue–whether the treatment of Roten's mental and physical health manifested a deliberate indifference to his serious medical need.

According to the Verified Complaint, on the morning of May 27, 2022, Roten "woke up with a serious desire to commit suicide."   He alleges that between "0600 HRS and 1100HRS" he

asked Corrections Defendants Davis, Myers, and Lewis that he be allowed to speak with Defendant Wittman and to be placed in the POC, but his requests were ignored. Verified Compl., ¶ 126 – 128. He also alleges that between "1100 HRS and 1300 HRS," he communicated with "Defendant Coulehan, Defendant Buzas, inter alia PRC Defendants, that he was suicidal and needed to speak with psych and he requested to be placed in POC." *Id.*, ¶ 129. According to Roten, "[a]t no time during the first shift on May 27, 2022, did any medical or psych employee provide any mental health services / suicide prevention treatment to Mr. Roten, no Defendant took proper action." *Id.* ¶ 131.

"Between 1300 HRS and 1430 HRS," Roten "ingested toxic amounts of medications and controlled substances with intent to commit suicide." *Id.* ¶ 132. Other prisoners "began kicking their doors to obtain emergency medical assistance for Mr. Roten, who was overdosing." *Id.* ¶ 134. Roten alleges that Defendant Grimm came to Roten's cell and initially refused to take immediate action. Eventually, Roten was escorted to medical by Corrections Defendant Hollowood.

Then, according to Roten, "Defendant Wellpath" improperly assessed him and did not contact poison control or request an ambulance. Corrections Defendants McCormick, Long, Churilla, and Ingraham eventually took Roten to an outside hospital by a DOC transport vehicle. While at the hospital, Roten contends the Corrections Defendants, *among other things,* interfered with his communications with the hospital staff, and that upon his return to SCI-Greene, "Defendant McCormick refused to notify prison medical staff that Roten's bladder was damaged requiring straight catheter to void urine, causing further injuries." *Id.* ¶ 144. Upon his return to SCI-Greene, Roten was placed into a POC.

20

While in a POC, Roten was seen by the SCI Greene Suicide Prevention Committee, which "consists of Defendants Wellpath, Centurion, Trout, Silberschmidt, Wittman, et al." *Id.* ¶ 163. Roten submits that he received inadequate psychiatric care while in the POC. *Id.* ¶ ¶ 162 - 180. Roten also submits that he received inadequate physical health care after his May 27, 2022 suicide attempt. *Id.* ¶ ¶ 181 – 202.

The Verified Complaint makes clear that Roten challenges the mental health and medical care he has received. It is well-settled that "an inmate's dissatisfaction with a course of medical treatment, standing alone, does not give rise to a viable Eighth Amendment claim." *Tillery v. Noel*, 2018 WL 3521212, at *5 (M.D. Pa. June 28, 2018) (collecting cases). Such complaints fail as constitutional claims because "the exercise by a doctor of his professional judgment is never deliberate indifference." *Gindraw v. Dendler*, 967 F. Supp. 833, 836 (E.D. Pa. 1997) (citing *Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.")).

The Court finds that Roten has presented serious and troubling allegations that, if true, demonstrate a plausible right to relief under the Eighth Amendment. The Court recognizes that discovery may well reveal that the alleged conduct of the Defendants does not give rise to an Eighth Amendment claim for deliberate indifference, but at this stage of the litigation, the allegations of the Verified Complaint must be accepted as true and all reasonable inferences must be drawn in Roten's favor. The Court will allow these claims to proceed to discovery.

### b.    Conditions of Confinement

From May 27, 2022 until June 20, 2022, Roten was placed in two different POCs. He contends that these cells were a "filthy, denigrating, and tortuous environment," where he encountered, among other things, "constant sleep-depriving illumination," "human feces, human

21

urine, and other unknown bodily fluids," insects, spiders, extremely poor air quality, inadequate ventilation, and excess dust in the air.  Verified Compl., ¶¶ 149 – 161.  He also contends that the conditions of solitary confinement subject him "to an increased risk of substantial physical and mental harm, suicide attempts, bodily injuries."  *Id.*, ¶¶ 209 – 213, 244.  He alleges that Defendants were aware of his conditions of confinement, through his written and verbal communications complaining about these conditions and how these conditions were exacerbating his mental illness.  Roten has been in solitary confinement since December 2020.  *Id.*, ¶ 64.

Based on Roten's allegations of conditions in IMU/ RRL, as well as his prolonged solitary confinement,[13] and the effect on his mental illness, the Court finds that Roten sufficiently alleges (1) an objectively, sufficiently serious denial of the minimal civilized measure of life's necessities and (2) Defendants were deliberately indifferent to his health and safety.  The Court will allow these claims to proceed into discovery.

### 2.    Fourteenth Amendment

Roten contends that Defendants, "jointly and severally" have violated his due process protections by, among other things:

> discriminat[ing] against Mr. Roten on the basis of his mental disabilities, by continuously housing Mr. Roten in solitary confinement as a disciplinary and administrative inmate on the Restricted Release List as an alternative to providing the level of care to other inmates with similar mental disabilities.

> discriminat[ing] against Mr. Roten by refusing to provide Mr. Roten increased levels of needed care and accommodations to effectively treat and manage his mental disabilities on the basis of Mr. Roten's mental disabilities are not what they believe to be serious enough.

. . .

---

[13]    The Court is mindful that solitary confinement "does not, in itself, violate the Constitution" and isolation "may be a necessary tool of prison discipline."  *Young v. Quinlan,* 960 F.2d 351, 364 (3d Cir. 1992), superseded on other grounds by statute.

> depriv[ing] Mr. Roten of any avenue to appeal Defendant Little's placement of Mr. Roten on RRL, by denying Mr. Roten's appeals without individualized consideration, by informing Mr. Roten that appeal of RRL placement is not permitted.
>
> depriv[ing] Mr. Roten of any avenue to appeal IMU placement by never providing him advance written notice of IMU in December 2021, by arbitrarily denying Mr. Roten's IMU appeals, and by later informing Mr. Roten that IMU 30-day appeal cannot be appealed in April 2022.

Verified Compl., ¶ 234-235, 239-240.  "The Fourteenth Amendment's Due Process Clause protects persons against deprivations of life, liberty, or property; and those who seek to invoke its procedural protection must establish that one of these interests is at stake." *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005). In analyzing a procedural due process claim, "the first step is to determine whether the nature of the interest is one within the contemplation of the 'liberty or property' language of the Fourteenth Amendment." *Shoats v. Horn*, 213 F.3d 140, 143 (3d Cir. 2000). If the asserted interest falls within the protections of the Due Process Clause, the second step is to determine whether the plaintiff was afforded "all of the process he was due." *Id*. The threshold question is whether Roten has asserted a liberty interest sufficient to trigger due process protections.

In the prison context, a protected liberty interest arises only where a restraint "imposes an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Williams v. Secretary Pennsylvania Dep't of Corrections*, 848 F.3d 549, 558-59 (3d Cir. 2017).  In determining whether a condition of confinement creates a protected liberty interest, a court must consider: "(1) the duration of the challenged conditions; and (2) whether the conditions overall imposed a significant hardship in relation to the ordinary incidents of prison life." *Shoats v. Horn*, 213 F.3d 140, 144 (3d Cir. 2000). *See also Williams*, 848 F.3d at 560 (quoting *Shoats*); *Powell v. Weiss*, 757 F.3d 338, 346 (3d Cir. 2014) (noting that *Shoats* is the governing standard).  )).  The

hardship inquiry is "fact-intensive."  *Id.* (quoting *Mitchell v. Horn*, 318 F.3d 523, 532-33 (3d Cir. 2003).

The Corrections Defendants argue that Roten's due process claim fails as a matter of law because he has no liberty interest in remaining free from the housing conditions associated with the IMU or the RRL because he has not experienced an atypical and significant hardship. Moreover, the Corrections Defendants argue that "to the extent [Roten] was entitled to any due process whatsoever, his own allegations describe several avenues of redress available to him."  Br. at p. 14 (ECF No. 34). Roten responds that he is bringing a "liberty interest-based procedural process claim based on his assignment to the RRL initially and Defendants refusal to remove him – despite his "multiple suicide attempts, condemning him to prolonged solitary confinement without due process in violation of the fourteenth amendment."  Omnibus Resp., ¶ 1, p. 5.  He argues he was placed into the IMU at SCI-Greene with no advance notice or any ability to be heard or challenge, and that his "periodic reviews are perfunctory and meaningless." *Id.* at ¶ 3.

Given the changing legal landscape of indefinite solitary confinement and Roten's contentions that his placement in the IMU/ RRL and the lack of a clear avenue to be removed from the RRL or a review process, has resulted in, or contributed to, his indefinite detention in solitary confinement, the Court will allow this claim to proceed to discovery.

The Centurion Defendants assert that "any attempted Fourteenth Amendment claim based upon the same facts as alleged to support an Eighth Amendment claim is barred by the doctrine set forth in *Albright v. Oliver*, 510 U.S. 266 (1994) and *Graham v. Connor*, 490 U.S. 386 (1989)." Br. at p. 11 (ECF No. 49).  At this early juncture, it is not clear if Roten's Fourteenth Amendment claims are based upon the same facts as his Eighth Amendment claim pertaining to his medical treatment.  This issue can be fleshed out during discovery.

For all these reasons, the motions to dismiss Roten's Fourteenth Amendment claims will be denied.

### 3.    Punitive Damages

Finally, the Medical Defendants seek to have Roten's claim for punitive damages dismissed because the Verified Complaint makes no allegations suggesting that the Medical Defendants acted willfully and in gross disregard of the rights of Roten. At the motion to dismiss stage, the Court makes no judgment about what occurred.   Thus, the Court finds this request to be premature.  The request is denied without prejudice to the Medical Defendants to raise this issue, if appropriate, at summary judgment.

## VI.    Conclusion

For all these reasons, the motion to dismiss filed by the Corrections Defendants will be denied in its entirety, and the motions to dismiss filed by the Medical Defendants and the Centurion Defendants will be granted in part and denied in part.  An appropriate Order follows.


April 8, 2024                                          s/Cynthia Reed Eddy
                                                      Cynthia Reed Eddy
                                                      United States Magistrate Judge


cc:     ISIAH ANDREW ROTEN
        MH 9309
        SCI GREENE
        169 PROGRESS DRIVE
        WAYNESBURG, PA 15370
        (via U.S. First Class Mail)

        All Counsel of Record
        (via ECF electronic notification)